UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


MARGO ROBBINS et al.,

                Plaintiffs,                FILE NO. 5:05-CV-182

v.                                    HON. ROBERT HOLMES BELL

AMERICAN PREFERRED
MANAGEMENT COMPANY, INC. et al.,

                Defendants.
_____/

## OPINION

      This is a civil rights action filed by Plaintiffs Margo Robbins and Charlene Hayes for

disability discrimination, sexual harassment and retaliation action filed pursuant to the Fair

Housing Act ("FHA"), 42 U.S.C. §§ 3604 and 3617, Section 504 of the Federal

Rehabilitation Act, 29 U.S.C. § 794, the Michigan Persons With Disabilities Civil Rights Act

("PWDCRA"), MICH. COMP. LAWS §§ 37.1502, 37.1506a and 37.1602(a), and the Michigan

Elliott-Larsen Civil Rights Act ("ELCRA"), MICH. COMP. LAWS § 37.2501(d).  The action

also raises a claim of common law negligence.  The matter comes before the Court on four

motions for summary judgment, two filed by Defendant American Preferred Management

Co., Inc. ("American Preferred"), Paul Knauss and Lynne Trahan (Docket ## 56, 58), and

two filed by A&D Development Co. ("A&D") (Docket ## 60, 64).   For the reasons that

follow, the motions are granted.

## I.

The following facts are taken from the evidence in the light most favorable to Plaintiffs.

This action arises out of alleged sexual harassment and disability discrimination by Paul Knauss, maintenance manager for Hidden Valley, a 60-unit subsidized apartment complex in Hastings, Michigan, which is managed by Defendant American Preferred and owned by A&D. Plaintiffs allege that Knauss engaged in sexually harassing behavior that Trahan ignored and, at the direction of Trahan, Knauss and others purposefully failed to accommodate their disabilities. Plaintiffs also allege that, in retaliation for their attempts to exercise their rights under state and federal law, Defendants increased their harassing behavior and ultimately filed eviction proceedings, which were eventually settled with Plaintiffs moving out.

Hidden Valley provides subsidized housing for the elderly and disabled. Trahan, age 67, worked as the apartment manager at Hidden Valley from 1981 until she retired in 2005. Knauss, age 70, worked as a part-time maintenance man at Hidden Valley from April 1995 to September 2003, when he resigned. Margo Robbins, age 55, receives social security disability on the basis of her fibromyalgia. She moved into her Hidden Valley apartment on April 4, 2002. Charlene Hayes, age 65, moved into the complex on June 21, 2002. Hayes has asthma and allergies to chemicals and irritants, which she allegedly reported to Trahan at the time she moved in. She also suffers from an anxiety disorder, for which she is receiving social security benefits.

2

Both Robbins and Hayes allege that Knauss engaged in a variety of sexually harassing conduct and discriminated against them on the basis of their disabilities.  They also allege that Defendants retaliated against them for complaining about the allegedly discriminatory conduct.

Hayes makes a variety of complaints about Knauss' conduct.  First, she testified that, shortly after she moved into the apartment in June 2002, she noticed Knauss standing in the shrubbery next to her front porch.  Knauss did not appear to be working and did not have any tools in his possession.  (Hayes dep. at 58-61, 112-13, 128, 143-45.)  She testified that on other occasions during her tenancy, Knauss stood by her front door operating a leaf blower and drove his tractor near her living room window on a couple of occasions.  (Hayes dep. at 113, 128-29, 184-86.)

Hayes also claims that Knauss and other maintenance people entered her apartment without notice on several occasions.  In July 2002, Hayes found that a subsidized food delivery had been left in the refrigerator, with a note advising her that Trahan and Knauss had been in her apartment.  (Hayes dep. at 58-66, 104-05, 168-69.)  Another time, Knauss came to her apartment without notice, carrying a subsidized food delivery.  Knauss walked past Hayes into the kitchen and asked where she wanted the delivery placed, ignoring the bench just inside the door that Hayes had positioned for deliveries.  (Hayes dep. at 114-15.)

In August 2002, Knauss walked into her apartment without knocking and without prior notice, stating that he had heard a fan running without a furnace or air conditioning unit

3

that required immediate investigation. (Hayes Aff. ¶2.) In September 2002, Knauss entered the apartment, again without knocking. He brushed against Hayes' body as he passed her walking to the kitchen. Ms. Hayes was embarrassed because her underwear and lingerie was visible in preparation for laundering. She left the room and later concluded that a pair of red underpants was missing. (Hayes dep. at 103-06, 119-25, 169-70, 243-45.) A few days later, Knauss forced open Hayes' screen door and placed the newspaper behind it, startling Hayes. (Hayes dep. at 146-48, 245-48.) Later that fall, Knauss and Don Service, another maintenance man, entered Hayes' apartment without notice. Hayes was in bed and threw a blanket around her to cover herself. (Hayes dep. at 126-29.) On January 9, 2003, Hayes discovered that her apartment had been entered without notice to investigate a gas leak, though no leak was found. Hayes complained to Trahan about Knauss entering her apartment without notice and against her wishes. Knauss then confronted Hayes, telling her that, if she continued to complain, he would not help her in an emergency. (Hayes dep. at 233-34, 254-55.)

On January 1, 2004, Trahan left a note informing Hayes that an exterminator, accompanied by Knauss, would come to spray her apartment on January 2, 2003. After failing to reach Trahan with her objections, Hayes called the Hastings Police Department to intervene as she claimed to have no insects in need of spraying and was afraid to be exposed to the chemicals. (Hayes dep. 83-84.) She also complains that Defendants authorized the spraying of trees in the area near the house, despite their being on notice that she had severe

4

allergies to chemicals.  (Hayes dep. 78-79, 81.)  In addition, upon discovery of water damage in her apartment caused by an outdoor sprinkler, Trahan allegedly directed Knauss to repair the damage and spray the carpet with a chemical to remove the mildew.  Knauss allegedly used an aerosol, despite having been warned by Hayes of her allergy.  Knauss sprayed the area and turned the spray nozzle into the room toward Hayes, spraying toward her from about five feet away.  The exposure allegedly triggered an asthmatic reaction for Hayes.  (Hayes dep. 79, 87-91-96.)

Hayes also alleges that on one occasion she heard something and believed a man was in her apartment while she was showering.  (Hayes dep. at 115-16.)  She also testified that a pair of gold-tone earrings and a book were taken and her other books were moved.  (Hayes dep. at 119-22, 166; Pl. Ex. 7.)  Hayes filed a police complaint on April 24, 2003, alleging that her bookshelves had been rearranged and her paper towel had been removed from the holder and placed in the cabinet.  (Pl. Ex. 42.)  In addition, she alleges that, on one occasion, a metal object was placed in her garbage disposal and, on another occasion, the shower selector was put in a different position than she left it.  (Hayes dep. at 113, 122.)  In addition, her car was "keyed" in the apartment parking lot.  (Pl. Ex. 7.)

Hayes testified that, at the time she moved into her apartment, she advised Trahan of her medical issues, including her need to avoid exposures to chemicals and other irritants. During the course of her residence at Hidden Valley, Hayes complained to Jessica Melson of Michigan Multi Family Asset Managers about Knauss and other maintenance men

5

entering her apartment.  (Pl. Ex. 1, 9, 10, 11; Hayes Aff.; Trahan dep. at 75-79, 134-39; Woodrow dep. at 39-40.))  She also twice wrote Congressman Vern Ehlers in May 2003 to complain about stalking, verbal threats and assault by Hidden Valley employees.  (Pl. Ex. 18.)  She received no response.  Also in May, Hayes wrote three letters to Michael Woodrow at American Preferred, complaining about maintenance personnel entering her apartment without notice.  (Pl. Ex. 20, 21, 22.)  Woodrow responded by letter on June 12, 2003, advising Hayes about inspection policies.  (Pl. Ex. 23.)  In none of her letters did Hayes allege either disability discrimination or sexual harassment.

In response to Defendants' requests for admission, Hayes conceded that Knauss at no time made inappropriate comments in her presence.  (Def. Ex. D, ¶¶1-2.)  Hayes provides no evidence or testimony that, in her complaints to management, she alleged that Knauss was sexually harassing her.

In March  2003, Hayes sought a personal protection order against Knauss.  The Barry County Circuit Court denied an ex parte order.  On April 16, 2003, after a notice and hearing, the court dismissed the matter for lack of jurisdiction, as Knauss had no present or past domestic relationship with Hayes that would support issuance of an order.  (Pl. Ex. 13, 15.)

Margo Robbins also complains that Hidden Valley employees, especially Knauss, entered her apartment without notice or permission and that she did not hear them knock. The first occasion occurred in the spring of 2003, when Knauss came to her apartment to change a doorknob, following her request for a handicapped doorknob.  (Robbins dep. at

109-111.)  On a second occasion, Knauss entered her apartment to check her blinds, lifting her curtains and then turning and walking out.  (Robbins dep. at 113-14.)  During a third encounter, Robbins testified she was coming out of the bathroom in her pajamas.  Knauss went to the thermostat, looked at it, and left.  (Robbins dep. at 117-19.)  Knauss apparently brushed against Robbins with the side of his body on both of the last two occasions.  (Robbins. dep. at 119-20, 124-25.)  On those occasions, no sexual touching occurred, though Robbins testified that Knauss' eyes looked threatening.  (Robbins dep. at 122.)  According to Robbins, Knauss also entered her apartment once, going to her oven and looking inside it.  (Robbins dep. at 144.)  Robbins also testified that she suspected but did not know that Knauss had been in her apartment on four or five other occasions when she was not present, as she found dirt tracked into her apartment.  (Robbins dep. at 128, 142.)  In addition, on one occasion, her *Reminder* newspaper was cut deeply by a box cutter in a manner she perceived to be intentional.  (Robbins dep. at 145-46.)  Knauss also once shoved the *Reminder* at Robbins while making a delivery.  (Robbins dep. at 151.)

Robbins also suspected that a pair of her underwear was taken by Knauss, though she could not state with certainty that underwear actually was missing.  (Def. A&D's Ex. F, Answers to Requests for Admission, ¶¶ 2-4.)  Robbins also testified that Knauss would peer into her window while working near her apartment.  (Robbins dep. at 14, 17.)  She alleges that he performed unnecessary work on the hedges or blowing the leaves in order to be able to peep into her windows.  (Robbins dep. at 20, 23.)

Robbins also contends that Defendants failed to accommodate her fibromyalgia and sleep disorder by creating loud disturbances that interfered with her sleep, such as blowing leaves unnecessarily and before 8:00 a.m. and cutting hedges that had just been cut. (Robbins dep. at 91-92.)  Robbins also testified that, on April 22, 2003, Knauss drove his lawn cart under her bedroom window, disturbing her.  (Robbins dep. at 130-31, 145-46.)

Robbins conceded in answers to Defendants' requests for admission that Knauss never made sexually inappropriate comments.  (Def. A&D's Ex. F.)  She also testified at her deposition that her allegations of sexually-based conduct were based on Knauss' demeanor and the way he looked at her.  (Robbins dep. at 87.)  She avers that her suspicions and fears regarding Knauss' motivation were validated by Knauss' subsequent statement to the police, discussed *infra*.  (Robbins Aff. at ¶ 4.)

Robbins also testified that, on one occasion, Knauss peered in the laundry room window at night, while she was alone and doing her laundry.  (Robbins dep. at 132.)  She also saw him after hours getting into his car, which was parked near her apartment rather than the office.  (Robbins dep. at 133.)  Robbins stated that her car bumper and quarter panels were kicked in and the car was keyed while she was living at Hidden Valley.  (Robbins dep. at 156-57.)

Robbins, like Hayes, wrote a letter to Congressman Ehlers on March 18, 2003, and supplemented it on April 22, 2003, complaining about intrusions by Hidden Valley maintenance staff without prior authorization.  (Pl. Ex. 25, 26.)  She also wrote to Jessica

8

Melson of Michigan Multi-Family Asset Managers to complain about the same conduct.  Ms. Melson wrote to Michael Woodrow about Robbins' complaints, and he responded to the allegations.  (Pl. Ex. 29, 30.)  In neither of those letters did she complain of disability discrimination or sexual harassment.

In July of 2003, Hayes and Robbins' letters to Congressman Ehlers were forwarded by the Attorney General to the Hastings Police Department.  The letters alleged that "the maintenance man was coming into their apartments unannounced and that on occasion he would come into their apartments when the residents were not fully dressed."  The Hastings Police Department began an investigation.  (Pl. Ex. 32.)  On September 9, 2003, one of the officers obtained a statement from Knauss to the effect that he had harassed tenants, had stolen underwear and later used it to masturbate, and had entered apartments without warning to catch residents in states of undress.  (Knauss dep. Ex. 2.)  On September 10, 2003, a warrant was issued against Knauss for assault with a deadly weapon, larceny in a building, and stalking.  (Pl. Ex. 32.)  Knauss was arrested.  Knauss, accompanied by an attorney, advised that he had been coerced to make a false statement, the officer telling him what to write, and he had written the statement in order to leave the police station.  Knauss later passed two lie detector tests and the charges against him were dropped and the case was dismissed.  (Pl. Ex. 32.)

Knauss resigned on September 9, 2003, after he gave a statement to police.  (Knauss dep. at 123.)  Shortly after his arrest, a personal protection order was issue against Knauss.

9

(Knauss dep. at 122-23.)  Knauss testified that he did not return to Hidden Valley after September 9, with the sole exception of September 18, 2003, when he picked up his property. (Knauss dep. at 123.)  Robbins, however, testified that the night before she moved out of the apartment in May 2004, she saw Knauss in his car, pointing his headlights toward her apartment.  (Robbins dep. at 80-81.)  At another time, Robbins testified that she and Hayes followed Knauss' vehicle from the complex to a location near where another maintenance man resided.  (Robbins dep. at 81-82.)

On October 29, 2003, Defendant A&D issued official notices to quit to Plaintiffs on the grounds that they had violated Rules 8 and 33 of the Rules and Regulations of the management company.  (Pl. Ex. 5.)  Those rules involve the prohibitions on interference with the rights and convenience of other residents and abuse of management agents and employees.  (Pl. Ex. 5, 37.)  On March 18, 2004, the parties entered into a negotiated settlement under which Plaintiffs agreed to move out, and the eviction action was terminated. (Pl. Ex. 38, 39.)

## II.

On a motion for summary judgment, a court must consider all pleadings, depositions, affidavits and admissions and draw all justifiable inferences in favor of the party opposing the motion.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The court, however, "'need not accept as true legal conclusions or unwarranted factual inferences.'"  *Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 533 (6th

Cir. 2002) (quoting *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987)). The party moving for summary judgment has the burden of pointing the court to the absence of evidence in support of some essential element of the opponent's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). Once the moving party has made such a showing, the burden is on the nonmoving party to demonstrate the existence of a genuine issue for trial. *Id.* Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Kocak v. Community Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005).

In order to prove that a triable issue exists, the nonmoving party must do more than rely upon allegations, but must come forward with specific facts in support of his or her claim. *Celotex*, 477 U.S. at 322; *Mulhall v. Ashcroft*, 287 F.3d 543, 550 (6th Cir. 2002). A party opposing a motion for summary judgment "may not merely recite the incantation, 'credibility,' and have a trial in the hope that a jury may believe factually uncontested proof." *Fogery v. MGM Holdings Corp., Inc.*, 379 F.3d 348, 353 (6th Cir. 2004). After reviewing the whole record, the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52

(1986)).  "'[D]iscredited testimony is not [normally] considered a sufficient basis'" for defeating the motion.  *Anderson*, 477 U.S. at 256-57 (quoting *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 512 (1984)).  In addition, where the factual context makes a party's claim implausible, that party must come forward with more persuasive evidence demonstrating a genuine issue for trial.  *Celotex*, 477 U.S. at 323-24; *Matsushita*, 475 U.S. at 586-87; *Street*, 886 F.2d at 1480.  "A mere scintilla of evidence is insufficient; 'there must be evidence on which a jury could reasonably find for the [non-movant].'"  *Daniels v. Woodside*, 396 F.3d 730, 734 (6th Cir. 2005) (quoting *Anderson*, 477 U.S. at 252).

### III.

A.    <u>Disability Discrimination</u>

Plaintiffs complain that they were subjected to discrimination on the basis of their disabilities in violation of both Section 504 of the Federal Rehabilitation Act of 1973 and the Michigan PWDCRA.[1]

The PWDCRA and § 504 require proof of the same elements and are analyzed under the same standard.  *See Chmielewski v. Xermac, Inc,*, 580 N.W.2d 817, 821 (Mich. 1998) (noting that PWDCRA and federal Americans with Disabilities Act ("ADA"), apply parallel

---

[1]Plaintiffs originally also alleged disability discrimination under the FHA.  Since the date of oral argument, the parties have stipulated to the Court's entry of partial summary judgment on Plaintiffs' claims of disability discrimination and sexual harassment under the FHA.  (Ord. Aug. 10, 2007, Docket #91.)

analyses); *Maddox v. Univ. of Tenn.*, 62 F.3d 843, 846 n.2 (6th Cir. 1995) (noting that ADA and § 504 are analyzed under same standard). In order to establish a prima facie case of disability discrimination under either statute, a plaintiff must establish that (1) she is a "handicapped[2] [disabled] person" who is (2) otherwise qualified for participation in the program, and (3) she was discriminated against solely by reason of her handicap. *Sandison v. Mich. High School Athletic Ass'n, Inc.*, 64 F.3d 1026, 1030-31 (6th Cir. 1995) *Maddox*, 62 F.3d at 846; *Chmielewski*, 580 N.W.2d at 821.

Under both statutes, a "disability" is defined as a physical or mental characteristic that substantially limits one or more of the major life activities of an individual and is unrelated to the individual's ability to work or to acquire, rent, or maintain property. 29 U.S.C. § 705(20); MICH. COMP. LAWS § 1103(d). A person may be disabled by having such a condition, being regarded as having such a condition, or having a history of such a condition. MICH. COMP. LAWS § 37.1103. It is not enough, for an impairment to affect a major life activity, but rather the employee must proffer evidence from which a reasonable inference can be drawn that such activity is substantially limited. *See Chiles v. Machine Shop, Inc.*, 606 N.W.2d 398 (Mich. Ct. App. 1999); *Gonzales v. Nat'l Bd. of Medical Examiners*, 225 F.3d 620, 627 n.12 (6th Cir. 2000) ("'substantially' suggests 'considerable,' 'specified to a large degree,' and 'in a substantial manner' and that 'substantial' means 'considerable in

---

[2]In 1992, the term "disability" was substituted for "handicap." Rehabilitation Act Amendments of 1992, Pub. L. 102-569, § 102(p)(32)(A), (B), 106 Stat. 4344(1992).

amount, value, or worth' 'being that specified to a large degree or in the main,' 'relating to or proceeding from the absence of a thing; essential' and 'of ample or considerable amount, quantity or dimensions.'") (citing *Sutton v. United Air Lines, Inc.*, 526 U.S. 1109 (1999)).

Defendants assert that neither Charlene Hayes nor Margo Robbins have demonstrated that they have a disability within the meaning of the statutes. In her responsive brief, Plaintiff Robbins concedes that the facts do not support her claim of disability discrimination. Her claim, therefore, will be dismissed without further discussion.

Plaintiff Hayes, however, contends that she has demonstrated a disability under both laws. First, Hayes contends that she is actually disabled by virtue of her asthma and other serious medical conditions. In support of that contention, she relies on her deposition testimony, during which she testified that she needed to avoid stress and exposure to chemicals and scented products, pollen, and tobacco smoke. (Hayes dep. at 255-57.) Her physician also has provided an affidavit stating that Hayes should avoid exposure to chemicals because such exposure could be life threatening. (Pl. Ex. 19, Aff. of L. Edara; Hayes dep. at 20-21, 77-79.) Plaintiff Hayes testified that she had informed Defendants of her severe allergies and that she needed to avoid chemicals in order to prevent exacerbation of her asthma. (Hayes dep. at 107.)

Plaintiff Hayes asserts that she is receiving social security disability benefits for her anxiety disorder, and that she has posttraumatic stress disorder. (Hayes dep. at 15, 108.) She also testified to numerous other physical problems, including osteoporosis, chronic fatigue syndrome, stress incontinence, esophagitis, and gastritis. (Hayes dep. 66-67.)

14

At no time, however, has Hayes testified or provided other evidence of any substantial limitation on a major life activity that would qualify one of her conditions as a disability under the statutes.  Indeed,  she responded to a lengthy series of questions by opposing counsel as follows:

Q.    Yeah.  At the time that you applied for tenancy and the time you terminated tenancy, during that period were you always able to live by yourself and care for yourself?

A.    Yes.

Q.    And were you able to attend to your own personal hygiene?

A.    Yes.

Q.    Including washing your hair?

A.    Yes.

Q.    Shaving?

A.    Yes.

Q.    Showering?

A.    Yes.

Q.    Brushing your teeth?

A.    Yes.

Q.    Dressing yourself?

A.    Yes.

Q.    You could cook for yourself?

A.    At times I was too tired.

Q.    You could clean for yourself?

A.    Yes.

Q.    You could go out and about into the community unrestricted?

A.    Yes.

                                    . . .

Q.    . . . Let me break it down this way: Could you walk?

A.    Sometimes with difficulty.

Q.    Okay.  And what are the difficulties you had when you's walk?

A.    I ache sometimes from the osteoarthritis.

Q.    Have you ever been prescribed or used ambulatory aids or assists such
      as a can, a walker, or a wheelchair?

A.    Not a cane, a walker, or a wheelchair.

Q.    Okay.  Has a physician ever prescribed or recommended your use of a
      cane, a walker, a wheelchair, or any other ambulatory assist?

A.    No.  I had a protective like a soft-shoe cast when – from my fractures.

Q.    And that was a short-term –

A.    Short-term.  Short-term.

Q.    Have you ever been ordered or prescribed to have barrier-free housing
      in any way?

A.    No.

Q.    Have you ever been ordered or prescribed to have barrier-free
      transportation in any way?

A.    No.

Q.    Have you ever been ordered or prescribed to have barrier-free parking in any way?

A.    Barrier-free parking?

Q.    Correct.

A.    Do you mean handicapped parking?

Q.    No, I mean barrier-free.

A.    I don't know what "barrier-free" is.

Q.    That means where there's no limitations – physical structures or limitations to your ability to get in or out of the car or access to transportation.

A.    No.

Q.    Has there ever been prescribed or recommended or have you sought the need to have home household-assist products to either clean, cook, have access to your cabinets, have access to your rooms, anything like that?

A.    The asthma/allergy doctor has told me to use and not use certain products.

Q.    Other than that, anything?  To physically assist you in or around the home.

A.    You want to know devices?

Q.    Yeah.  I want to know if any physician has ever prescribed, recommended, or you had the need to use products to assist you in or out of the home in going about your activities of daily living.

A.    Yes, anti-dust mite products.

Q.    Anything else?

A.    Yes, a mask when I vacuum.

17

(Hayes dep. at 71-72, 75-77.)  In sum, Plaintiff Hayes' testimony identifies no major life activity in which she is substantially limited.  She therefore has failed to demonstrate that she is disabled within the meaning of the statutes.  *See Gonzales*, 225 F.3d at 627.

Plaintiff Hayes next argues that, even if she cannot demonstrate a disability under the statutes, she has shown that Defendants regarded her as disabled.  The Supreme Court has laid out two ways in which an individual can be "regarded as" having a disability.  *Sutton*, 527 U.S. at 489 (analyzing ADA).  First, an employer can be under the mistaken belief that the employee is disabled, when in fact she is not.  *Id.*  Second, the employee can actually have a physical impairment, and the employer can know it, but the employer mistakenly believes that the employee is disabled because of the impairment when in fact she is not.  *Id.*; *see also E.E.O.C. v. Watkins Motor Lines, Inc.*, 463 F.3d 436, 443 (6th Cir. 2006).

Plaintiff claims that she told Defendants Knaus and Trahan to use non-aerosol sprays because of her asthma and allergy conditions.  Yet Knauss allegedly sprayed toward her with an aerosol from a distance of five feet because he knew she had asthma.  She also alleges that, according to Knauss' statement to Officer Brown, Knauss acknowledged that Trahan had directed him to make things difficult for the problem people and that they targeted Hayes because they knew she had asthma.

Although a plaintiff proceeding under this prong of the statute need not prove that she in fact had a disability, she nevertheless must show that the defendant regarded her as having a disability within the meaning of the statutes – not that the defendant merely regarded her

18

as having some physical impairment.  *See Chiles*, 606 N.W.2d at 406 (citing *Colwell v.
Suffolk County Police Dep't*, 158 F.3d 635, 646 (2d Cir. 1998)); *Logan v. Marathon
Petroleum Co., LLC*, 196 F. App'x 406, 409 (6th Cir. 2006) (proof that an employer regarded
an employee as impaired in some way is not sufficient to demonstrate liability under
"regarded as" prong of ADA; employee must show employer regarded her as being unable
to perform "major life activities").  Here, Plaintiff Hayes has done nothing more than allege
that Defendants sought to make her uncomfortable or cause her distress, knowing that she
had asthma.  If true, such conduct would be reprehensible.  The alleged facts, however, in
no way support an inference that Defendants regarded her as being disabled.  Nor has
Plaintiff introduced any other evidence of Defendants' intent or perception.

The Court therefore concludes that Defendants are entitled to summary judgment on
Plaintiffs' claims of disability discrimination under both state and federal law.

B.     Sexual Harassment

Plaintiff alleges that she has been subjected to sexual harassment in violation of the
Michigan ELCRA, MICH. COMP. LAWS § 37.2502.  The ELCRA prohibits discrimination
in real estate transactions "on the basis of religion, race, color, national origin, age, sex,
family status, or marital status."  *Id.*  The Michigan statute is interpreted consistently with its
federal counterpart, the Fair Housing Act, 42 U.S.C. § 3604(a).  *See Mencer v. Princeton
Square Apartments*, 228 F.3d 631, 634 (6th Cir. 2000).  Both federal and state law apply the
burden-shifting standard set forth in *McDonnell Douglas Corp. v. Green,*  411 U.S. 792

19

(1973).  Under that standard, as adapted to fair housing claims, a plaintiff must establish a prima facie case of discrimination.  In response, the defendant must offer a legitimate, nondiscriminatory reason for the housing decision.  The burden then shifts back to the plaintiff to show that the proffered reason is a pretext that masks discrimination.  *Mencer*, 228 F.3d at 634 (citing *Selden v. Dep't of Housing and Urban Dev.*, 785 F.2d 152, 160 (6th Cir. 1986)).

Sex discrimination includes sexual harassment, which is defined as "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature . . . ."  MICH. COMP. LAWS § 37.2103(i).  Proof of a prima facie case of sexual harassment may be made by one of two methods.  First, a plaintiff may demonstrate that she was the victim of quid pro quo sexual harassment by showing that (1) she was subjected to unwelcome sexual conduct as described in the statute, and (2) the defendant used her submission to or rejection of the proscribed conduct as a factor in an adverse action.  *See Chambers v. Trettco*, 614 N.W.2d 910, 915 (Mich. 2000); *Champion v. Nationwide Sec., Inc.*, 545 N.W.2d 596, 600 (Mich. 1996).  Second an individual may establish a claim of hostile environment sexual harassment by demonstrating the following elements: (1) the individual belonged to a protected group; (2) the individual was subject to communication or conduct on the basis of sex; (3) the individual was subjected to unwelcome sexual conduct or communication; (4) the unwelcome conduct or communication was intended to or in fact did substantially interfere with the individual's environment or

20

created an intimidating hostile or offensive environment; and (5) respondeat superior. *Radtke v. Everett*, 501 N.W.2d 155, 162 (Mich. 1993); *see also DiCenso v. Cisneros*, 96 F.3d 1004, 1008 (7th Cir. 1996) (applying federal standard for sexual harassment in employment to housing context, holding that claim is actionable "'when the offensive behavior unreasonably interferes with use and enjoyment of the premises'") (quoting *Honce v. Vigil*, 1 F.3d 1085, 1090 (10th Cir. 1993), and citing *Shellhammer v. Lewallen*, No. 84-3573, 1985 WL 13505 (6th Cir. July 31, 1985)).

Plaintiffs contend that they have sufficiently alleged and supported both quid pro quo and hostile environment sexual harassment claims.  The Court disagrees.

First, Plaintiffs have failed to demonstrate that they were subjected to communication or conduct on the basis of sex.  Plaintiffs identify no instance of communication containing any sexual content.  Nor did Knauss or any other Defendant make any sexual approach or contact.  Although Plaintiffs state that Knauss entered their apartments without warning and caught them in their nightgowns, they make no allegations of communication or conduct by Knauss, whether verbal or nonverbal, that could be construed by a reasonable factfinder as being sexual in nature.  While Knauss brushed against them in passing on occasion, both testified that no sexual touching occurred.  Moreover, regardless of what Knauss may have stated to Officer Brown about his own fantasies, Plaintiffs can identify no occasion on which Knauss conveyed those fantasies to them.  Further, assuming that Knauss operated equipment outside their apartments unnecessarily in order to look into the apartments, Knauss never

gestured or made other signs that his conduct was sexual in nature. Plaintiffs, in fact, never indicated in their complaints to management that they believed Knauss' actions were sexual in nature.

Plaintiffs, therefore fail to demonstrate that they were subjected to unwelcome sexual conduct or communication. *Mencer*, 228 F.3d at 634; *Radtke*, 501 N.W.2d at 162. As a consequence, both the quid pro quo and hostile environment claims fail.[3]

In addition, even if Knauss' entries into their apartments reasonably could have been construed as being sexually motivated, Plaintiffs fail to demonstrate that Knauss' conduct rose to the level of substantially interfering with their tenancy. The incidents were isolated events falling far short of the pervasiveness required to demonstrate hostile environment sexual harassment. *See DiCenso*, 96 F.3d at 1008 ("isolated and innocuous incidents do not support a finding of sexual harassment"); *Radtke*, 501 N.W.2d at 167 ("[W]hether a hostile work environment existed shall be determined by whether a reasonable person, in the totality of circumstances, would have perceived the conduct at issue as substantially interfering with

---

[3]Plaintiffs' claims against Defendants other than Knauss fail for yet another reason. Despite having communicated to Defendants Trahan, American Preferred and A&D their unhappiness with the way Knauss performed his duties, they failed entirely to place those Defendants on notice of their belief they were being sexually harassed. *See Diepenhorst v. City of Battle Creek* , No. 1:05-cv-734, 2007 WL 1141492, at *11 (W.D. Mich. Apr. 17, 2007) ("An employer 'must have notice of alleged harassment before being held liable for not implementing action.'") (quoting *Chambers v. Trettco, Inc.*, 614 N.W.2d 910, 916 (Mich. 2000)). Therefore, regardless of whether Knauss' conduct was sexually motivated, Plaintiffs have failed to demonstrate that the other Defendants were liable for any sexually harassing conduct by Knauss.

the plaintiff's [tenancy] or having the purpose or effect of creating an intimidating, hostile, or offensive [rental] environment.").

Here, Plaintiffs' complaints center on very few incidents, none of which was sexual in character.  At most, Knauss entered Plaintiffs' apartments without adequately announcing his presence or giving prior notice on a few occasions over a period of more than a year.  He also arguably went into their apartments when they were not present on a few additional occasions.  Assuming he took a pair of underwear from each, neither had evidence of that fact until after Knauss was no longer employed at Hidden Valley, when he made a statement to Officer Brown.  Knauss also brushed against each on one or two occasions while passing them in their apartments, but both agreed the contact was not sexualized, even if they found it troubling.  These events, if they imply any sexual content at all, are highly attenuated.  Moreover, they are sporatic at best, failing entirely to meet the pervasiveness required to create a hostile environment.  As a result, no genuine issue of fact exists to support their claims of sexual harassment.

C.     Retaliation

Plaintiffs allege in their complaint that they were subjected to retaliation, in violation of the FHA and the ELCRA, for seeking to eliminate Knauss' sexual harassment by applying for a personal protection order against him.   In their response to the motion for summary judgment, Plaintiffs belatedly allege that eviction was not the only retaliatory action for which they claim a violation.  They also assert that Knauss and maintenance employee Sonny

Ashcroft both admitted in their statements to police that Trahan had directed them to harass the troublesome tenants. They contend, therefore, that many of Knauss' other actions were taken in retaliation for their complaints about sexual harassment.

In the absence of direct evidence, in order to prove a claim of retaliation under the FHA, a plaintiff must meet the burden-shifting test of *McDonnell Douglas*, 411 U.S. 792. First, the plaintiff must demonstrate a prima facie case of retaliation. Once the plaintiff has established a prima facie case, the burden of production shifts to the defendant to produce evidence of a legitimate, non-discriminatory or non-retaliatory reason for its adverse action. The plaintiff then must prove that the proffered reason is pretextual. *Id.*; *Mencer*, 228 F.3d at 634; *Matras v. Amoco Oil Co.*, 385 N.W.2d 586, 589-90 (Mich. 1986); *Eckstein v. Kuhn*, 408 N.W.2d 131, 134 (Mich. Ct. App. 1987).

To establish a prima facie case of unlawful retaliation under the ELCRA, a plaintiff must establish

> (1) that he engaged in a protected activity; (2) that this was known by the defendant; (3) that the defendant took an ... action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse ... action.

*DeFlaviis v. Lord & Taylor, Inc.*, 566 N.W.2d 661, 663 (Mich. Ct. App. 1997).

Proof of a prima facie case under the FHA involves an essentially similar standard. Plaintiffs must establish the following elements: (1) they exercised a right guaranteed by the FHA, (2) Defendants' intentional conduct constituted coercion, intimidation, threat, or interference, and (3) there was a causal connection between their exercise of their FHA rights

24

and the Defendants' conduct. *Hood v. Midwest Sav. Bank*, 95 F. App'x 768, 779 (6th Cir. 2004). In order to demonstrate the causal connection, Plaintiffs must show that Defendants had actual knowledge of the protected activity. *Thaddeus-X v. Blatter*, 175 F.3d 378, 387 n.3 (6th Cir. 1999); *Burns v. City of Columbus*, 91 F.3d 836, 844 (6th Cir. 1996) (ADA retaliation claim).

Plaintiffs cannot demonstrate a prima facie case of retaliation. First, Plaintiffs fail to demonstrate that they exercised any right under the FHA. Although Plaintiffs made complaints about Knauss to management, police, legislators and agency officials, at no time did they claim they were being subjected to sexual harassment. *See Fleming v. FedEx Freight East*, No. 06-11275 2007 WL 2156280, at *2 (E.D. Mich. 2007) (holding that plaintiff failed to demonstrate she engaged in protected activity because she admittedly failed to complain to anyone that she was being subjected to discrimination on the basis of her sex); *Diepenhorst*, 2007 WL 1141492, at *13 (holding that plaintiff could not prove protected activity because she did not complain to anyone about sexual harassment prior to the adverse action.); *Larson v. Mich. Dep't of Corr.*, No. 261585, 2005 WL 2249089 (Mich. Ct. App. Sept. 15, 2005) (complaints regarding matters other than sexual harassment are not protected activity under the ELCRA). Indeed, Plaintiff Robbins' first administrative complaint of sex discrimination or harassment was filed on March 31, 2005, long after Plaintiffs left the rental property. (Def. A&D's Ex. P, Robbins Brief, Docket #65.) Further, the actions on their face did not suggest any sexual motivation. As a result, Plaintiffs fail to demonstrate that their

25

letters of complaint to various parties amounted to protected activity within the meaning of the acts.

Moreover, with respect to the allegedly retaliatory issuance of a notice to quit their tenancies one month after they obtained a personal protection order against Defendant Knauss, Plaintiffs have introduced no evidence that Defendants other than Knauss were on notice of the protection order. Indeed, the only testimony in the record is to the contrary. As a result, Plaintiffs fail to demonstrate the knowledge and causation elements of their claims of retaliation.[4]

D.   Negligence

In their final claim, Plaintiffs contend that Defendants have negligently failed to protect Plaintiffs, as business invitees, from unreasonable risks of injury that were known to them or should have been known to them. In their brief in opposition to summary judgment, Plaintiffs argue only that Trahan had been given notice that Plaintiff Hayes had asthma and was required to avoid direct exposure to aerosol sprays and other chemical irritants. Plaintiffs therefore allege that Defendants Trahan, American Preferred and A&D were negligent in supervising and training Knauss, thereby exposing her to aerosol spray that caused her a severe asthma attack.

---

[4]In light of the Court's conclusion regarding these elements of the claim, the Court need not and does not address Defendants' remaining arguments that the FHA retaliation claim is time-barred and that Plaintiffs have impermissibly amended their complaint in violation of the Court's case-management order issued August 10, 2006.

26

As Defendants note in their briefs, Plaintiffs fail to state a claim under Michigan law. In *Legal Serv. of Eastern Mich. v. Edward Rose Assoc., Inc.*,  No. 05-74705, 2007 WL 325353 (E.D. Mich. Jan. 31, 2007), the court addressed the viability of negligence claims asserted in conjunction with claims of discrimination under the FHA and other civil rights act.  In that case, as here, the plaintiff alleged in the complaint that the defendant was negligent in training, hiring and supervising apartment complex employees by failing to prevent discrimination.  The court held:

> Plaintiff claims Defendant Edward Rose Associates, Inc., was negligent in its failure to train, hire, and supervise its agents in order to prevent discrimination. Plaintiff's claim is without merit.  The Michigan Supreme Court recently held that where a plaintiff's claim is entirely based on a negligent violation of a statutorily created tort, the statute provides the sole remedy, unless there was a common-law remedy that predated the statute.  Plaintiff does not present any authority for a common-law claim for negligence in the context of housing discrimination.   Thus, Plaintiff is limited to statutorily created remedies. Defendants are entitled to summary judgment on Plaintiff's negligence claim.

*Id.*, No. 2007 WL 325353, at *5 (E.D. Mich. Jan. 31, 2007) (citing *McClements v. Ford Motor Co.*, 702 N.W.2d 166, 171 (Mich. 2005)).  In *McClements*, the court held that where the entire premise for a negligent retention claim is the statutorily based tort of sexual harassment, no negligence action exists outside that statute.  *Id.*  The court specifically held that, prior to the adoption of the ELCRA, Michigan common law did not provide a common-law remedy for workplace discrimination.  *Id.*

As in *McClements* and *Legal Services*, Plaintiffs in the instant case make allegations of negligent discrimination on the basis of sex and disability.  The Court finds that, under the

Michigan Supreme Court's reasoning in *McClements,* Plaintiffs' negligence claim must fail. Prior to adoption of the ELCRA and the PWDCRA, no common law claims existed for sex or disability discrimination.

### IV.

For the foregoing reasons, the Court will grant Defendants' motions for summary judgment.  A judgment consistent with this opinion shall be entered.


Date:  ___September 17, 2007___        /s/ Robert Holmes Bell
                                       ROBERT HOLMES BELL
                                       CHIEF UNITED STATES DISTRICT JUDGE